No. 197　　　　　March 12, 2025　　　　　509

IN THE COURT OF APPEALS OF THE STATE OF
OREGON

OREGON JUSTICE RESOURCE CENTER,
*Petitioner,*

*v.*

BOARD OF PAROLE AND POST-PRISON
SUPERVISION,
*Respondent.*

Board of Parole and Post-Prison Supervision
A181296

Argued and submitted June 14, 2024.

Alexander Coven argued the cause for petitioner. On the opening brief was Brian R. Decker and Oregon Justice Resource Center. Also on the reply brief was Julia Yoshimoto and Oregon Justice Resource Center.

Denise G. Fjordbeck, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Pagán, Presiding Judge, Lagesen, Chief Judge, and Mooney, Senior Judge.*

LAGESEN, C. J.

Petition for judicial review dismissed.

Mooney, S. J., dissenting.

_____

　*　Lagesen, C. J. *vice* Hadlock, S. J.

**LAGESEN, C. J.**

This is an administrative-rule-review proceeding under ORS 183.400. Petitioner, the Oregon Justice Resource Center, asserts that written and oral testimony about pending legislation by the then-chair of the Oregon Board of Parole and Post-Prison Supervision at a hearing of the Senate Committee on Judiciary constitutes an administrative rule under ORS 183.310(9). Because we conclude that legislative testimony about pending legislation by an agency representative is not a rule under the Oregon Administrative Procedure Act (APA), we dismiss this proceeding for lack of jurisdiction.

By way of background, during the 2023 legislative session, petitioner advocated in favor of Senate Bill 1027 (2023).[1] That measure proposed to change the statutory process for converting the terms of incarceration and allowing for the parole of persons convicted of murder or aggravated murder and sentenced to life imprisonment without possibility of parole. If enacted, the statute would have required such a person to be released on parole within 60 days of the date of a hearing at which the Board of Parole and Post-Prison Supervision unanimously found that the person was capable of rehabilitation and that the terms of imprisonment should be converted to life with possibility of parole. SB 1027 would have changed existing law in several ways with respect to the offenders covered by it. One significant change would have been to eliminate the board's authority under ORS 144.125 to conduct a hearing to assess whether a person has a "present severe emotional disturbance such as to constitute a danger to the health or safety of the community" before releasing such a person on parole, and by requiring parole solely on a finding that a person was "capable of rehabilitation." *See* ORS 144.125(3)(a) (2021); SB 1027, § 2 (2023).

In March 2023, the Senate Committee on Judiciary held what turned out to be the single public hearing on SB 1027. Greta Lowry, then-chair of the Oregon Board of Parole and Post-Prison Supervision, was one of several witnesses

---

[1] We draw our discussion of SB 1027 from the legislative record: SB1027 2023 Regular Session - Oregon Legislative Information System.

to testify. She provided both written and oral testimony. That testimony, which Lowry represented was on behalf of the board, is included in the appendices to this opinion.[2]

In her written testimony, Lowry noted that SB 1027 did not require proof of actual rehabilitation as a prerequisite to parole and further described it as eliminating an existing requirement that a person be actually rehabilitated prior to release on parole: "As actual rehabilitation would no longer be a requirement for release, the necessary balance of risk and rehabilitation, and the exploration of the dynamic factors implicit in both, would fail to be addressed." Testimony, Senate Committee on Judiciary, SB 1027, Mar 22, 2023, 1 (written statement of Greta Lowry).

In her oral testimony, Lowry described the existing statutory scheme, including the board's authority to conduct an exit interview "where the Board is tasked with making a release decision based on whether it finds that the adult in custody has a present severe emotional disturbance such as to constitute a danger to the health or safety of the community." Tape Recording, Senate Committee on Judiciary, SB 1027, Mar 23, 2023, at 01:19:30 (statements of Greta Lowry), Oregon Legislative Video (accessed Mar 4, 2025); Testimony, Senate Committee on Judiciary, SB 1027, Mar 22, 2023, 1 (accompanying written statement of Greta Lowry).

Lowry then explained how the changes proposed in SB 1027 would, in the board's view, eliminate safeguards for public safety by, among other changes, "remov[ing] the safeguard of *actual* rehabilitation, requiring only that an adult in custody be found likely to be rehabilitated within a reasonable period of time prior to release to the community." Tape Recording, Senate Committee on Judiciary, SB 1027, Mar 23, 2023, at 01:20:40 (statements of Greta Lowry), Oregon Legislative Video (accessed Mar 4, 2025); Testimony, Senate Committee on Judiciary, SB 1027, Mar 23, 2023, 1 (accompanying written statement of Greta Lowry) (emphasis in original).

The bill did not make it out of committee.

---

[2] Lowry submitted a written version of her oral testimony into the legislative record, in addition to her written testimony. The hearing is viewable here: Oregon Legislative Video.

In May 2023, petitioner initiated this proceeding. Petitioner alleges that Lowry's written and oral testimony regarding SB 1027 "contain the challenged rule for which review is sought." Petitioner asserts that Lowry's testimony stating or implying that current law requires "actual rehabilitation" as a prerequisite to release on parole constitutes an administrative rule—which petitioner denominates the "actual rehabilitation rule"—that is subject to review under ORS 183.400. For the reasons that follow, we conclude that legislative testimony is not an administrative rule and, therefore, dismiss the petition for lack of jurisdiction.

ORS 183.400 allows for judicial review of administrative rules. For purposes of that provision, a "rule" is "any agency directive, standard, regulation or statement of general applicability that implements, interprets or prescribes law or policy, or describes the procedure or practice requirements of any agency." ORS 183.310(9). "If a particular agency writing is not a rule within the meaning of ORS 183.310(9), then we do not have jurisdiction under ORS 183.400 to determine its validity: 'When the matter in question is not a rule, we have no authority to review it under ORS 183.400.'" *Smith v. Dept. of Corrections*, 300 Or App 309, 311, 454 P3d 12 (2019) (quoting *Smith v. DCBS*, 283 Or App 468, 471-72, 388 P3d 1253, *rev den*, 361 Or 350 (2017)). Because the question whether Lowry's testimony is a rule is a jurisdictional one, we have an independent obligation to determine whether we have jurisdiction under ORS 183.400, regardless of the parties' specific arguments on the point. *Maloney v. Bryant*, 332 Or App 745, 756, 552 P3d 90 (2024) (explaining that the Court of Appeals has an obligation to consider, *sua sponte*, whether it has jurisdiction); *Schwartz and Battini*, 289 Or App 332, 338, 410 P3d 319 (2017) (explaining that issue of subject matter jurisdiction cannot be waived and can be raised at any time). As the party invoking our jurisdiction under ORS 183.400, petitioner bears the burden of demonstrating that the testimony for which it seeks judicial review constitutes an administrative rule.

Petitioner has not done so. Petitioner posits that Lowry's testimony constitutes a "statement of general

applicability" within the meaning of ORS 183.310. That argument misapprehends what that phrase means in the context of the Administrative Procedure Act. As the Supreme Court recently clarified, "the definition of 'rule' contemplates an *expression* of an agency decision that has 'general applicability' in the sense that it is made operative—*i.e.*, the agency somehow has communicated the decision in a way that purports to bind those subject to it." *PNW Metal Recycling, Inc. v. DEQ*, 371 Or 673, 699, 540 P3d 523 (2023), *adh'd to as modified on recons*, 372 Or 158 (2024) (emphasis in original). Applying that definition, the court concluded that the Department of Environmental Quality had not issued a "rule" when it informed regulated parties that, although it had previously interpreted a statute to not require a permit for their operations, it was changing that interpretation and requiring the parties to obtain permits. *Id*. at 698-701. The court explained "that an agency's interpretive decision is not, itself, a rule, although the generally applicable expression of such a decision could be." *Id*. at 700 (footnote omitted).

Here, the testimony that petitioner points to is not, on its face, an "expression" of an agency decision that purports to bind anyone or even an "expression" of the operative legal standard for an exit interview. Rather, on its face, the testimony simply purports to describe the consequences of SB 1027's proposed requirement that a parole release date be set within 60 days of a finding that a person is capable of rehabilitation and the corresponding elimination of the existing exit-interview process, which allows the board to assess a person's present dangerousness, rather than simply evaluate whether the person is presently "capable" of rehabilitation. Although Lowry's testimony equates the elimination of the exit-interview process with "remov[ing] the safeguard of actual rehabilitation," in context, that equivalence was a nontechnical, common-sense way of describing how current law operates. Lowry did not testify that the board applies, or intends to apply, an "actual rehabilitation" standard when conducting exit interviews. Beyond that, her oral testimony describing the exit interview process accurately described the operative "present severe emotional disturbance" standard and did not identify or articulate any

sort of binding standard beyond that explicitly stated in the applicable statutes. Lowry's summary of the correct legal standard using the phrasing of ORS 144.225 further refutes petitioner's assertion that Lowry's later testimony, describing the effect of eliminating the exit-interview process, represented an expression that a generally applicable "actual rehabilitation" rule would govern exit interviews. Under those circumstances, there is no basis for us to conclude that Lowry's testimony mentioning "actual rehabilitation" constitutes a "statement of general applicability" within the meaning of ORS 183.310(9).

Our conclusion that petitioner has not shown that Lowry's testimony constitutes a "rule" for purposes of ORS 183.310(9) is consistent with the history of the APA. As David B. Frohnmayer, then a law professor and chair of the Interim Subcommittee on Administrative Procedure Act Reform of the Legislative Counsel Committee, recounted in his essay *The Oregon Administrative Procedure Act: An Essay on State Administrative Rulemaking Procedure Reform*, much of the Oregon APA, as we know it today, was enacted in 1971 and was based on a draft act prepared by the Oregon Bar Committee on Administrative Law. *Essay on State Administrative Rulemaking Procedure Reform*, 58 Or L Rev 411, 416-20 (1980) (summarizing the legislative history of the Oregon APA). The proposed definition of a rule—which is broader than the definition of a rule in the federal Administrative Procedure Act—prompted concerns from agency administrators:

> "The extraordinary breadth of the definition of [a rule] raises a question whether agencies must promulgate as rules their statements of opinion, office guidelines, field handbooks, and the like, *and even the public speeches or statements of agency administrators*."

*Id*. at 429 (emphasis added). One agency administrator was concerned that the agency would have to engage in rulemaking anytime he or his deputies opined on the legality, propriety, or wisdom of proposed laws. *Id*. at n 85. The Bar Committee alleviated those concerns by affirmatively stating that the concerns raised by the agency administrator did not fall within the definition of a "rule" subject to

rulemaking, emphasizing that the "general applicability" requirement would operate to ensure that such statements would not require rulemaking. *Id*. That history of Oregon's APA demonstrates that the drafters of the act did not intend for the broad statutory definition of a "rule" to cover each and every opinion by an agency head regarding a proposed or existing law, even if made in public statements.

Finally, although the board does not appear to have recognized the point, we note that even if legislative testimony could, conceivably, constitute "a statement of general applicability," testimony falls within an explicit exception to the definition of a rule. Under ORS 183.310(9)(b), "[a]ction by agencies directed to other agencies or other units of government which do not substantially affect the interests of the public" does not constitute a rule. For purposes of the statute, to "substantially affect the interests of the public" an action must, at a minimum, be "self-executing," and not require additional agency action before it affects either "public or private interests." *Rogue Flyfishers v. Water Policy Review Bd.*, 62 Or App 412, 417, 660 P2d 1089 (1983).[3] Such exclusions from the definition of a "rule" were intended to provide "sufficient flexibility to allow agencies to perform essential executive functions without unnecessary procedural obstacles" such as having to undergo the rulemaking process simply to communicate. Frohnmayer, *Essay on Administrative Law*, 58 Or L Rev at 432-33 (citing and quoting *United Parcel v. Transp. Comm.*, 27 Or App 147, 150, 555 P2d 778 (1976) (internal quotation marks omitted)). Indeed, treating communications between an executive agency and the legislature that do not affect the interests of the public in a self-executing way would frustrate the underlying purpose of exemptions from actions considered "rules." Here, Lowry's testimony was "directed to" another unit of government: the legislature. And it did not "substantially affect the interests of the public" as we have construed that term, because it did not operate directly on public or private interests.

---

[3] In *Rogue Flyfishers* we construed the phrase "do not substantially affect the interests of the public" for purposes of ORS 183.310(9)(a), not for purposes of ORS 183.310(9)(b). Although we were focused on a different provision of ORS 183.310, "[i]t is a longstanding principle of statutory construction that words may be assumed to be used consistently throughout a statute." *Pete's Mountain Homeowners v. Ore. Water Resources*, 236 Or App 507, 518, 238 P3d 395 (2010).

Testimony about law, standing alone, does not function in a self-executing way as law itself. For that additional reason, we conclude that Lowry's testimony is not a rule subject to judicial review under ORS 183.400.

We acknowledge, as petitioner points out, that Lowry's characterization of the exit-interview process as encompassing a requirement of "actual rehabilitation" is at odds with the Supreme Court's characterization of the process in a footnote in *Janowski/Fleming v. Board of Parole*, 349 Or 432, 458-59 n 24, 245 P3d 1270 (2010) ("There is no statutory and regulatory authority for any further procedure to determine actual rehabilitation or for conditioning parole release on such a determination, and neither we nor the board are permitted to add any such procedure to the statutes or rules."). To the extent that Lowry's testimony could be construed as suggesting that before a person convicted of murder or aggravated murder who has their sentence converted to life with possibility of parole can be paroled, a factfinder must find that the person is "actually rehabilitated"—as distinct from assessing whether the person has a present severe emotional disturbance such as to constitute a danger to the health or safety of the community—that testimony would be incorrect and, potentially, misleading. As noted, at issue in an exit interview is whether a person "has a present severe emotional disturbance such as to constitute a danger to the health or safety of the community." ORS 144.125(3)(a). The fact that Lowry's testimony was incorrect, however,[4] does not supply a basis for concluding that her testimony sets a binding legal standard that will govern the board's conduct of exit interviews for persons who have their sentences converted to life with possibility of parole.[5]

---

[4] The dissenting opinion infers that Lowry's testimony is "false." Although that inference may be one reasonable inference, in our view, it is not the only reasonable understanding of Lowry's testimony. Because we have included the testimony in the appendices to this opinion, readers may draw their own conclusions about it.

[5] That Lowry's testimony is not a rule is underscored by another feature of our caselaw. It is well-established that, subject to the exception to mootness created by ORS 14.175, we lack jurisdiction to review a rule that has been repealed and must dismiss as moot a proceeding to review a repealed rule under ORS 183.400. *Mooney v. Oregon Health Authority*, 314 Or App 809, 811, 500 P3d 79 (2021) (citing *Reid v. DCBS*, 235 Or App 397, 401, 232 P3d 994 (2010)). Were we to conclude that her testimony was a rule, we would then be faced with a second

Petition for judicial review dismissed.

**MOONEY, S. J.,** dissenting.

When the Chair of the Board of Parole and Post-Prison Supervision (Parole Board) testified before the Senate Judiciary Committee, she told the senators that if SB 1027 were to become law, "actual rehabilitation would no longer be a requirement" to convert a convicted murderer's life sentence to one with the possibility of parole. In fact, ORS 163.105(3) provided, and still provides, that

> "[i]f *** the board *** finds that the prisoner *is capable of rehabilitation* and that the terms of the prisoner's confinement should be changed to life imprisonment with the possibility of parole *** it shall enter an order to that effect[.]"

(emphasis added). Indeed, "[t]he sole issue [at a murder review hearing] is whether or not the prisoner is likely to be rehabilitated within a reasonable period of time." ORS 163.105(2). "Actual rehabilitation" is not the same as "capable of rehabilitation." The Parole Board Chair's testimony was, thus, incorrect.

Petitioner contends that the Chair's statement amounted to the announcement of a new agency rule within the meaning of ORS 183.310(9). It challenges that rule, arguing that it is invalid because it was adopted without following applicable rulemaking procedures and because it exceeds the statutory authority of the Parole Board. The Parole Board responds, in part, that the Chair did not announce a new rule, but instead "correctly stated current law." According to the Parole Board, its Chair's statement was "directed to the impact of proposed legislation" and "had no effect on the [Parole B]oard's existing procedures." The Parole Board asks us to dismiss the petition for judicial review because, according to it, there is no rule to review. The majority reaches the result advocated by the Parole Board and it characterizes the Chair's statement as "a

---

jurisdictional question: whether legislative testimony for a bill that died in committee in 2023 nevertheless remains a current rule for purposes of ORS 183.400. Our understanding of the Oregon APA, and its objectives of improving governmental function, make it unlikely that the legislature intended to enact a scheme that would lead to such an inquiry.

nontechnical, common-sense way of describing how current law operates." 338 Or App at 514. I disagree.

I would conclude that the Parole Board Chair's statement regarding "actual rehabilitation" was a "statement of general applicability" within the meaning of ORS 183.310(9) and that it constituted a rule subject to review in this court. I would, thus, reach the merits of petitioner's rule challenge and invalidate the rule because the Parole Board did not follow applicable rulemaking procedures in creating it and because the rule exceeds the Parole Board's statutory authority.

When the Parole Board Chair testified before the Senate Judiciary Committee, she explained that her purpose was to provide the committee members with "a foundational understanding of where we are now" in terms of the "current parole process." Audio Recording, Senate Committee on Judiciary, SB 1027, Mar 23, 2023, at 1:17:19 (testimony of Parole Board Chair Greta Lowry), https://olis.oregonlegislature.gov (accessed Jan 8, 2025). She noted that "the Board is a statutory creature, meaning that we are obligated to follow the processes that have been spelled out and authorized by statute[.]" *Id.* Her purpose in providing testimony was "to explain how SB 1027 intersects with our current process and how its passage would impact the Board, victims, and our communities." *Id.* When she testified that "SB 1027 removes the safeguard of *actual* rehabilitation, requiring only that an adult in custody be found likely to be rehabilitated within a reasonable period of time prior to release into the community," *id.* (emphasis added), she necessarily told the committee that current law required actual rehabilitation. Her written testimony echoed her oral testimony and expressed that same point. Testimony, Senate Committee on Judiciary, SB 1027, Mar 22, 2023, (written statement of Parole Board Chair Greta Lowry).[1] It was an expression of a

---

[1] The Parole Board Chair's written testimony included, in part:

"SB 1027 only requires that an Adult in Custody (AIC) demonstrate that they are likely to be rehabilitated within a reasonable period of time prior to being released to the community; it does not require an AIC to demonstrate *actual*, meaningful rehabilitation consistent with public safety. The ultimate outcome of this approach is that AICs who are not yet safe to be in the community will be released, within 60 days of their hearing, if the [Parole] Boards finds them likely to be rehabilitated within a reasonable period of time. As actual rehabilitation would no longer be a requirement for release,

rule that, according to the Parole Board Chair, was currently binding on the Parole Board. *See PNW Metal Recycling, Inc. v. DEQ*, 371 Or 673, 699, 540 P3d 523 (2023), *adh'd to as modified on recons*, 372 Or 158, 546 P3d 286 (2024) (explaining that "the definition of 'rule' contemplates an *expression* of an agency decision that has 'general applicability' in the sense that it is made operative—*i.e.*, the agency somehow has communicated the decision in a way that purports to bind those subject to it" (emphasis in original)).

It is important to acknowledge that the Parole Board Chair announced a rule that had never before been made public. In fact, she announced a rule that, to those schooled in the laws governing the Parole Board process, made no sense because it was directly at odds with the standard for murder review hearings codified in ORS 163.105:

"(2) At any time after completion of a minimum period of confinement pursuant to subsection (1)(c) of this section, the State Board of Parole and Post-Prison Supervision, upon the petition of a prisoner so confined, shall hold a hearing to determine if the prisoner is likely to be rehabilitated within a reasonable period of time. The sole issue is whether or not the prisoner is likely to be rehabilitated within a reasonable period of time. At the hearing, the prisoner has:

"(a) The burden of proving by a preponderance of the evidence the likelihood of rehabilitation within a reasonable period of time;

"* * * * *

"(3) If, upon hearing all of the evidence, the board, upon a unanimous vote of three board members or, if the chairperson requires all voting members to participate, a unanimous vote of all voting members, finds that the prisoner is capable of rehabilitation and that the terms of the prisoner's confinement should be changed to life imprisonment with the possibility of parole, release to post-prison supervision or work release, it shall enter an order to that effect[.]"

---

the necessary balance of risk and rehabilitation, and the exploration of the dynamic factors implicit in both, would fail to be addressed."

(Emphasis in original).

And to the extent that the Parole Board argues that its Chair's comments were describing the impact of SB 1027 on the "exit interview" that ORS 144.125 permits—rather than the murder review hearing under ORS 163.105—it is important to recognize that "actual rehabilitation" does not apply in that context either. *See Janowski/Fleming v. Board of Parole*, 349 Or 432, 458 n 24, 245 P3d 1270 (2010) (explaining that after the Parole Board has found that an adult in custody is capable of rehabilitation at a murder review hearing, "[t]here is no statutory or regulatory authority for any further procedure to determine actual rehabilitation or for conditioning parole release on such a determination").

When the Parole Board Chair told the committee that SB 1027 would eliminate actual rehabilitation as "a requirement for release," she announced a rule that by her own description was current and binding. She announced a rule so wholly at odds with the true statutory standard that it would reasonably be heard as a new rule by those familiar with existing law. It is difficult to understand the Board's assertion in this court that the Chair's statement was a correct statement of the law. It was not. And describing the Chair's statement as a "nontechnical" description of how current law works does not change the essential character of the statement as an expression of a Parole Board rule in a way that says "this is the rule that is presently binding on us and on those who come before us." It was a statement of general applicability, made by the Parole Board Chair in her official capacity, without equivocation, for the specific purpose of informing legislators that the Parole Board was currently required to find actual rehabilitation before releasing a convicted murderer. It is reasonable to infer that her point was to be sure that the committee members thought—incorrectly—that a vote for SB 1027 would be a vote to lower the release threshold from actual rehabilitation to mere capacity to be rehabilitated. Not unsurprisingly, the bill never made it out of that committee.

This case is factually uncomfortable. The Parole Board Chair appeared before the Senate Judiciary Committee as it considered a bill that would have had a direct and significant impact on the Parole Board's work,

and she told them that the bill, if passed, would require the Parole Board to release convicted murderers from prison before those prisoners were actually rehabilitated. The problem is that actual rehabilitation has never been required in the release process. The Chair either created a false legislative record about existing law or she revealed a new rule that had not before been publicly announced. Either is unacceptable. Because the Parole Board Chair's testimony meets the definition of a "rule," I would address the merits of the petition before us, and I would declare the rule to be invalid. If anything, the discomfort occasioned by the circumstances of this case makes the need to reach its merits all the more compelling. Today is, as always, an excellent time to embrace our role in the checks and balances so fundamental to our government.

Respectfully, I dissent.

## APPENDIX 1— ORAL TESTIMONY OF GRETA LOWRY



**Board of Parole and Post-Prison Supervision**
1321 Tandem Ave. NE
Salem, OR 97301
(503) 945-0900
http://egov.oregon.gov/BOPPPS

ORAL TESTIMONY – 3/23/23

Chair Prozanski, Vice-Chair Thatcher, and Members of the Committee.

For the record my name is Greta Lowry, and I am the Chairwoman of the Oregon Board of Parole and PostPrison Supervision. With me today is John Bailey, Vice-Chairperson of the Board.

The Board submitted written testimony regarding SB 1027 yesterday, and so I believe the most prudent use of our time today is to provide a brief, high-level overview of the current parole process, so that as you consider the necessity and appropriateness of any changes, you have a foundational understanding of where we are now and why. Upon the conclusion of that overview, I will explain how SB 1027 intersects with our current process and how its passage would impact the Board, victims, and our communities.

At the outset it is worth noting that the Board is a statutory creature, meaning that we are obligated to follow the processes that have been spelled out and authorized by statute, and as interpreted over time by the courts. In many instances a legal requirement is imposed upon the Board to conduct a three-step release process to include a Murder Review Hearing, a Prison Term Hearing, and an Exit Interview.

For those under the authority of the Board, who have been convicted of Aggravated Murder or Murder, the release process begins with a Murder Review Hearing. In that hearing, Board is tasked with determining whether an adult in custody is likely to be rehabilitated within a reasonable period of time. The adult in custody is entitled to an attorney, is able to call support persons to testify on their behalf, and is questioned by the Board. A representative of the committing jurisdiction and any designated victim's representatives are entitled to appear and make a statement to the Board. The standard of proof is that of a preponderance of the evidence, and the burden is carried by the adult in



**Board of Parole and Post-Prison Supervision**
1321 Tandem Ave. NE
Salem, OR 97301
(503) 945-0900
http://egov.oregon.gov/BOPPPS

custody. If the Board does not find that an adult in custody has carried their burden, a deferral period of 2-10 years is selected, and a Final Order is drafted.

In the alternative, if the board determines an adult in custody has carried their burden, a prison term calculation is conducted immediately upon the conclusion of the Board's deliberation. If an adult in custody has already served more time than the board could legally impose at a prison term hearing, the adult in custody is scheduled for an Exit Interview as soon as the board hearings calendar allows. Currently, the Board schedules hearings six months in advance. This is what happens in the vast majority of cases.

If the adult in custody has not already served more time than the Board could legally impose, then a Prison Term Hearing would be scheduled. In these hearings the adult in custody is not entitled to an attorney, however they are able to make arguments and call upon support persons to testify on their behalf after they are questioned by the Board. A representative of the committing jurisdiction and any designated victim's representatives are entitled to appear and make a statement to the Board. Upon the conclusion of the hearing, the Board deliberates and determines a prison term, and the adult in custody would then see the Board for an Exit Interview at the end of that prison term.

The final step of the release process is that of an Exit Interview, where the Board is tasked with making a release decision based upon whether it finds that the adult in custody has a present severe emotional disturbance such as to constitute a danger to the health or safety of the community. In these hearings the adult in custody is not entitled to an attorney, however they are able to make arguments and call upon support persons to testify on their behalf after they are questioned by the Board. A representative of the committing jurisdiction and any designated victim's representatives are entitled to appear and make a statement to the Board. The burden of finding a present severe emotional disturbance is on the Board. Per statute, in preparation for an Exit Interview, an adult in custody



**Board of Parole and Post-Prison Supervision**
1321 Tandem Ave. NE
Salem, OR 97301
(503) 945-0900
http://egov.oregon.gov/BOPPPS

is required to undergo a thorough psychological evaluation. Refusal to participate in that psychological evaluation is a sufficient, independent reason to defer an adult in custody. If the Board finds that an adult in custody has a present severe emotional disturbance, a deferral period of between 2-10 years is selected. If the Board finds that an adult in custody does not have a present severe emotional disturbance, their release date is affirmed, and the release planning process with the Department of Corrections and the Community Corrections agency of the receiving county begins.

So that is a very brief explanation of each type of hearing and the possible outcomes, with exceptions and caveats omitted due to the constraints of time.

That primer leads us to SB 1027, how it intersects with our current process and how its passage would impact the Board, victims, and our communities. It is the Board's position that the decisions made in a Murder Review Hearing and an Exit Interview are both essential for public safety. The decisions are made based upon a different threshold question, under a different standard, and with different evidence and information. The elimination of any part of the current structure would significantly hamper the Board's ability to do what it does best, which is make individualized and informed risk-based decisions. Clearly, the intent of SB 1027 is to reduce the three hearings process down to a single hearing. In its current form, however, a number of safeguards provided by the current process are lost.

SB 1027 removes the safeguard of actual rehabilitation, requiring only that an adult in custody be found likely to be rehabilitated within a reasonable period of time prior to release into the community.

SB 1027 removes the safeguard of a psychological evaluation, by eliminating the Board's authority to order or require an adult in custody to undergo a psychological evaluation prior to release into the community.



**Board of Parole and Post-Prison Supervision**
1321 Tandem Ave. NE
Salem, OR 97301
(503) 945-0900
http://egov.oregon.gov/BOPPPS

SB 1027 removes the safeguard of thorough release planning, allowing only 60 days to plan for a successful and safe transition prior to release into the community.

SB 1027 removes the safeguard of surety and confidence that victims have in our criminal justice system, by once again altering and advancing processes prior to release into the community.

Put another way, SB 1027 simply lowers the bar for release of this particular population of adults in custody.

And to be clear, the population that we're discussing today represents those among us who have taken the most, and who have proven themselves capable of causing significant, irreparable harm. Therefore, any changes to the release process deserve careful consideration, should not be rushed, and should involve meaningful discussion among stakeholders from every corner of the criminal justice system. Indeed, changes of this magnitude, changes that touch the lives of so many, should be entered into thoughtfully, collaboratively, and with considerations of public safety the priority of any permanent policy change.

Mr. Bailey and myself would be happy to answer any questions the Committee may have. Thank you.

## APPENDIX 2—WRITTEN TESTIMONY OF GRETA LOWRY



**Board of Parole and Post-Prison Supervision**
1321 Tandem Ave. NE
Salem, OR 97301
(503) 945-0900
http://egov.oregon.gov/BOPPPS

March 22, 2023

The Honorable Senator Floyd Prozanski, Chair

Senate Committee on Judiciary, Members

Testimony re: SB 1027

Dear Chair Prozanski, Vice-Chair Thatcher, and Members of the Committee on Judiciary,

The Board of Parole (Board) has reviewed the proposed changes to the Oregon parole hearings process in SB 1027 and offers this testimony to identify some potential impacts a single hearings process would bring.

### I. Requires the Board to release before rehabilitation actually occurs.

SB 1027 only requires that an Adult in Custody (AIC) demonstrate that they are likely to be rehabilitated within a reasonable period of time prior to being released to the community; it does not require an AIC to demonstrate actual, meaningful rehabilitation consistent with public safety. The ultimate outcome of this approach is that AICs who are not yet safe to be in the community will be released, within 60 days of their hearing, if the Board finds them likely to be rehabilitated within a reasonable period of time. As actual rehabilitation would no longer be a requirement for release, the necessary balance of risk and rehabilitation, and the exploration of the dynamic factors implicit in both, would fail to be addressed.

Additionally, SB 1027 removes the Board's authority to postpone a firm release date for those convicted of murder and aggravated murder once the release date is set. In practice, this means that the Board will no longer be able to rescind parole for AICs who engage in serious misconduct after a successful parole hearing, but prior to actual release.



**Board of Parole and Post-Prison Supervision**
1321 Tandem Ave. NE
Salem, OR 97301
(503) 945-0900
http://egov.oregon.gov/BOPPPS

## II. Requires the Board to release without the benefit of a psychological evaluation.

SB 1027, by eliminating the Exit Interview under ORS 144.125, also eliminates the Board's clear authority to order psychological evaluations for use in parole release

decisions, as well as the requirement that an AIC undergo a psychological evaluation prior to release. A psychological evaluation is the best piece of information that the Board has relative to an AIC's risk for future sexual or physical violence and is therefore an essential element in the analysis of risk and rehabilitation. Without these evaluations, which can be upwards of 40 pages long, the Board would be making critical decisions regarding the health and safety of our communities with incomplete information, which is incompatible with public safety.

Finally, because SB 1027 does not require an AIC to participate in a psychological evaluation prior to a hearing, an AIC can refuse to participate in an evaluation, and the Board would have no recourse but to proceed and potentially release an AIC who has made a threshold showing of being likely to be rehabilitated within a reasonable period of time based solely on historical information already contained in the record, and information gleaned from the AIC during the hearing. This would be a dramatic departure from current practice and hinder the Board's core task of analyzing current risk.

## III. Concerns on how to operationalize the concept within the time frame as drafted.

Section 8 of the Bill requires that upon the effective date, anyone who has previously been found likely to be rehabilitated within a reasonable period of time, but who has not yet been deferred at an Exit Interview under ORS 144.125, is required to be released within 60 days if an Exit Interview is not accomplished. These additional hearings would create an undue burden on the Board, which is already stretched to its limit accommodating juvenile commutation hearings. The Board hearings schedule is



**Board of Parole and Post-Prison Supervision**
1321 Tandem Ave. NE
Salem, OR 97301
(503) 945-0900
http://egov.oregon.gov/BOPPPS

created six months in advance, with psychological evaluations being ordered four months prior to a hearing, making additions to that schedule difficult, especially given the limited capacity of Department of Corrections institutions to adapt to last minute changes.

The frank reality of this provision is that a number of AICs convicted of murder and aggravated murder would have their prior prison term invalidated, and they would be released into the community prior to a finding by the Board that they do not have a present severe emotional disturbance such as to constitute a danger to the health or safety of the community.

SB 1027 requires the Board, upon a likely finding, to release an AIC within 60 days of the hearing date. This is an unrealistic timeline, given the work involved in safely transitioning someone to the community. The Board must rely on multiple community partners, including the Department of Corrections and Community Corrections, to investigate and approve housing, employment options, and programming opportunities. Additionally, this time frame does not account for those releasing on an Interstate Compact, or those who have special housing or intensive medical care requirements. Simply stated, release 60 days from the hearing date is not in the best interest of public safety, nor is it in the best interest of an AIC seeking a successful transition back into a community that is drastically different from the community they left.

## IV.  Changing landscape for victims

Finally, the consideration of victim's rights and the impacts that procedural changes bring is consistently in the forefront of the Board's mind. The Board routinely hears from victims that while the current hearings process can be arduous, they appreciate the bifurcation and the 'checks and balances' approach that it brings. Oregon is an opt-in state, and victims can choose to participate in all, none, or only certain hearings held before the Board. This participation can take many forms, including written and in person testimony.



**Board of Parole and Post-Prison Supervision**
1321 Tandem Ave. NE
Salem, OR 97301
(503) 945-0900
http://egov.oregon.gov/BOPPPS

The Board is in the unique position to regularly interact with survivors of sexual and physical assault, as well as the loved ones of those who have been taken through acts of tremendous violence. We are routinely told that they are in part able to heal from the trauma they have experienced by relying on the promises made by the criminal justice system, among the most important being the guarantee that their perpetrators will serve specific sentences. In the Board's experience, when we make release decisions, it often means a mother will have to relive the moment she heard that her son was killed; a daughter will have to revisit the moment she found the bodies of her dead parents; or a father will have to remember the moment he learned his daughter was raped and left for dead. The retroactive application of SB 1027 to include those who have been found likely at a Murder Review Hearing and are currently serving their imposed prison term further traumatizes victims and erodes the trust placed in the criminal justice system.

No matter how many hearings are involved in the parole process, traumas will be brought to the surface and horrors will be relived. It is therefore incumbent upon the Board to make the most informed and thoughtful decisions possible at every turn, with the best and most evidence available, ensuring a safe and just process for victims and all Oregonians.

Thank you for taking the time to consider our concerns. We look forward to engaging with all stakeholder groups and participating in an official workgroup to collaboratively discuss any potential changes to this system.

Sincerely,

Greta Lowry

Board Chairwoman

Oregon Board of Parole